No. 22-15188

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

ORACLE USA, INC., a Colorado corporation;
ORACLE AMERICA, INC., a Delaware corporation;
ORACLE INTERNATIONAL CORPORATION, a California corporation,

*Plaintiffs-Appellees*,

*v.*

RIMINI STREET, INC., a Delaware corporation,

*Defendant-Appellant*.

_____

On Appeal from the United States District Court
For the District of Nevada (Hon. Larry R. Hicks), No. 2:10-cv-0106-LRH-VCF

_____

**<u>UNDER SEAL</u>
OPENING BRIEF FOR APPELLANT RIMINI STREET, INC.**

_____

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
(202) 682-7511
Mark.Perry@weil.com

Jeremy M. Christiansen
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Samuel G. Liversidge
Eric D. Vandevelde
Blaine H. Evanson
Ilissa S. Samplin
Casey J. McCracken
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(949) 451-3805
BEvanson@gibsondunn.com

*Attorneys for Defendant-Appellant Rimini Street, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel of record certifies that Defendant-Appellant Rimini Street, Inc. is a publicly traded corporation and has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

Dated: May 18, 2022

s/ *Blaine H. Evanson*
Blaine H. Evanson

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................4

ISSUES PRESENTED............................................................................................5

CONSTITUTIONAL AND STATUTORY PROVISIONS.....................................5

STATEMENT OF THE CASE................................................................................5

    I.    Previous Litigation Regarding Enterprise Software Support...............6

    II.    The Contempt Proceeding..................................................................12

SUMMARY OF THE ARGUMENT .....................................................................19

STANDARDS OF REVIEW .................................................................................22

ARGUMENT .........................................................................................................23

    I.    The District Court Erred in Construing the Permanent
        Injunction to Cover Lawful Conduct Not Adjudicated in
        *Rimini I*.................................................................................................23

        A.    The District Court Erred in Holding That *De Minimis*
            Copying Violated the Permanent Injunction...............................23

            1.    The "Snippets" of Oracle Code in Rimini's JDE
                  Technical Design Specifications Were *De Minimis*............24

            2.    The District Court Erroneously Held That *De Minimis*
                  Copying Violated the Injunction. ........................................26

        B.    The District Court Erred in Expanding the Permanent
            Injunction's Prohibition on "Cross-Use." ...................................30

            1.    Rimini Did Not Engage in, and Oracle Did Not
                  Accuse, the "Cross-Use" Adjudicated in *Rimini I*..............30

**TABLE OF CONTENTS**
(continued)

**Page**

   2. The Conduct for Which Rimini Was Found in Contempt Was Never Previously Adjudicated as Infringing. ........................................................31

   3. The "Cross-Use" for Which Rimini Was Found in Contempt Is Licensed and Non-Infringing. ........................36

  C. The District Court Erred in Holding Rimini in Contempt for Licensed Copying of an Oracle Database File. .....................41

   1. The OLSA Authorized Rimini's Copying. ..........................41

   2. The Terms of the OLSA Are Properly Before This Court. ...................................................................43

II. The District Court Erred in Holding Rimini in Contempt for Conduct That Is More Than Colorably Different from the Conduct Adjudicated in *Rimini I*.........................................................46

  A. *TiVo* Requires Civil Litigation, Not a Contempt Proceeding, for the Adjudication of Colorably Different Conduct...........................................................46

  B. The District Court Erroneously Refused to Apply *TiVo*. .............48

III. The District Court's Sanctions Must Be Vacated. ...............................53

  A. Civil Contempt Sanctions Must Be Carefully Cabined to Not Become Punitive, Criminal Contempt Sanctions.................53

  B. The District Court's Order of Sanctions Is Not Properly Coercive or Compensatory. .........................................................55

  C. The Punitive Contempt Sanctions Must Be Vacated. ..................57

CONCLUSION ......................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
166 F.3d 772 (5th Cir. 1999) ...............................................................45

*Apple Comp., Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994) ...............................................................42

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011) .............................................................45

*Bell v. Wilmott Storage Servs., LLC*,
12 F.4th 1065 (9th Cir. 2021) ...............................................1, 23, 38

*Bingman v. Ward*,
100 F.3d 653 (9th Cir. 1996) ........................................................55, 58

*Cal. Artificial Stone Paving Co. v. Molitor*,
113 U.S. 609 (1885)..............................................................................47

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .............................................................50

*In re Chase & Sanborn Corp.*,
872 F.2d 397 (11th Cir. 1989) .................................................55, 56, 57

*CoStar Grp., Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) ...............................................................38

*In re Crystal Palace Gambling Hall, Inc.*,
817 F.2d 1361 (9th Cir. 1987) .....................................................55, 59

*de Fontbrune v. Wofsy*,
838 F.3d 992 (9th Cir. 2016) ...............................................................58

*Disney Enters., Inc. v. VidAngel Inc.*,
2017 WL 6820015 (C.D. Cal. Sept. 13, 2017) ...................................48

*Dolman v. Agee*,
157 F.3d 708 (9th Cir. 1998) ...............................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) ................................................................47

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006)...........................................................................49

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
  844 F.3d 79 (2d Cir. 2016) ...............................................................38

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998)...........................................................................46

*Fox Film Corp. v. Doyal*,
  286 U.S. 123 (1932)...........................................................................49

*Gen. Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986) ...............................3, 54, 55, 56, 57, 60

*Goodyear Tire & Rubber Co. v. Haeger*,
  137 S. Ct. 1178 (2017).......................................................................60

*Hester Indus., Inc. v. Tyson Foods, Inc.*,
  160 F.3d 911 (2d Cir. 1998) ..............................................................22

*Ho v. Brennan*,
  721 F. App'x 678 (9th Cir. 2018) ......................................................45

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
  957 F.3d 1038 (9th Cir. 2020) ...........................................................22

*Int'l Rectifier Corp. v. IXYS Corp.*,
  383 F.3d 1312 (Fed. Cir. 2004) .........................................................45

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994)...............................................54, 55, 57, 58

*Kennewick Irrigation Dist. v. United States*,
  880 F.2d 1018 (9th Cir. 1989) ...........................................................43

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Knickerbocker Toy Co., Inc. v. Azrak-Hamway Int'l, Inc.*,
   668 F.2d 699 (2d Cir. 1982) ................................................................. 23

*KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*,
   776 F.2d 1522 (Fed. Cir. 1985) ............................................................ 47

*L.A. News Serv. v. Reuters Television Int'l Ltd.*,
   149 F.3d 987 (9th Cir. 1998) ................................................................ 58

*Lasar v. Ford Motor Co.*,
   399 F.3d 1101 (9th Cir. 2005) ....................................................... 55, 58

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
   964 F.2d 965 (9th Cir. 1992) ................................................................ 18

*Manufactured Home Cmtys. Inc. v. City of San Jose*,
   420 F.3d 1022 (9th Cir. 2005) .............................................................. 49

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) .............................................................. 42

*Mercoid Corp. v. Mid-Continent Inv. Co.*,
   320 U.S. 661 (1944) ............................................................................. 48

*Miller v. United States*,
   587 F.2d 991 (9th Cir. 1978) ................................................................ 22

*Nat'l Parks Conservation Ass'n v. EPA*,
   788 F.3d 1134 (9th Cir. 2015) .............................................................. 29

*Newton v. Diamond*,
   388 F.3d 1189 (9th Cir. 2004) ................................................. 23, 24, 26

*Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union*,
   721 F.3d 1122 (9th Cir. 2013) ...................................... 4, 54, 55, 59

*NLRB v. Ironworkers Local 433*,
   169 F.3d 1217 (9th Cir. 1999) ...................................................... 4, 54

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Norse v. Henry Holt & Co.*,
991 F.2d 563 (9th Cir. 1993) ...............................................................28

*On Davis v. The Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) ................................................................28

*Oracle USA, Inc. v. Rimini St., Inc.*,
783 F. App'x 707 (9th Cir. 2019)..................................... 2, 4, 11, 19, 20, 27, 28

*Oracle USA, Inc. v. Rimini St., Inc.*,
879 F.3d 948 (9th Cir. 2018) .............. 2, 5, 6, 7, 8, 10, 11, 30, 31, 43, 45, 46, 52

*Oracle USA, Inc. v. Rimini St., Inc.*,
2021 WL 1224904 (D. Nev. Mar. 31, 2021) ........................................13

*Oracle USA, Inc. v. Rimini St., Inc.*,
2015 WL 5165374 (D. Nev. Sept. 3, 2015)........................................10

*Oracle USA, Inc. v. Rimini St., Inc.*,
6 F. Supp. 3d 1086 (D. Nev. 2014)......................................7, 8, 31, 51

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info.*
*Techs., Inc.*,
369 F.3d 645 (2d Cir. 2004) ......................................................55, 56

*Parsons v. Ryan*,
949 F.3d 443 (9th Cir. 2020) ......................................4, 54, 55, 57, 59

*Peter v. Nantkwest, Inc.*,
140 S. Ct. 365 (2019)........................................................................49

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014)........................................................................48

*Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC*,
339 F.3d 1146 (9th Cir. 2003) .........................................................45

*Rimini St., Inc. v. Oracle Int'l Corp.*,
No. 2:14-cv-01699-MMD-DJA (D. Nev. filed Oct. 15, 2014) ............9

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Rimini St., Inc. v. Oracle USA, Inc.*,
139 S. Ct. 873 (2019) ...................................................................... 11, 49

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
137 S. Ct. 954 (2017) ............................................................................ 48

*Shell Offshore Inc. v. Greenpeace, Inc.*,
815 F.3d 623 (9th Cir. 2016) ............................................................... 53

*Shuffler v. Heritage Bank*,
720 F.2d 1141 (9th Cir. 1983) ......................................... 54, 55, 56, 59

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ............................................... 3, 23, 28, 48, 49

*St. Clair Cnty. v. Lovingston*,
90 U.S. 46 (1874) ................................................................................ 23

*State Indus. Inc. v. A.O. Smith Corp.*,
751 F.2d 1226 (Fed. Cir. 1985) ........................................................... 49

*Stewart v. Abend*,
495 U.S. 207 (1990) ............................................................................. 29

*Taggart v. Lorenzen*,
139 S. Ct. 1795 (2019) ......................................................................... 48

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
322 F.3d 1064 (9th Cir. 2003) ............................................................. 45

*TiVo, Inc. v. EchoStar Corp.*,
646 F.3d 869 (Fed. Cir. 2011) .................................................... 3, 21, 47

*U2 Home Entm't, Inc. v. Wei Ping Yuan*,
245 F. App'x 28 (2d Cir. 2007) ................................................. 4, 58, 59

*United States v. AT&T, Inc.*,
916 F.3d 1029 (D.C. Cir. 2019) .......................................................... 29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Holden*,
   908 F.3d 395 (9th Cir. 2018) .......................................................29, 30

*United States v. Jordan*,
   256 F.3d 922 (9th Cir. 2001) ...............................................................40

*United States v. Paramount Pictures*,
   334 U.S. 131 (1948)..............................................................................49

*United States v. U.S. Dist. Ct. for N. Mariana Islands*,
   694 F.3d 1051 (9th Cir. 2012) .......................................................22, 53

*United States v. Washington*,
   761 F.2d 1419 (9th Cir. 1985) .............................................................22

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*,
   689 F.2d 885 (9th Cir. 1982) ...............................................................47

*Webb v. Powers*,
   29 F. Cas. 511 (C.C.D. Mass. 1847)....................................................23

**Statutes**

17 U.S.C. § 502 ......................................................................................27

17 U.S.C. § 504 ...............................................................................18, 58

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8..............................................................28, 48

## INTRODUCTION

Oracle accused Rimini Street of violating a permanent injunction that constrains the ways in which Rimini is allowed to provide third-party support to licensees of Oracle software. After the parties engaged in wide-ranging discovery, Oracle filed a motion for an order to show cause why Rimini should not be held in contempt. Following a hearing limited to ten discrete issues, the district court found Rimini in contempt on five of them and imposed $630,000 in monetary sanctions, along with attorneys' fees and costs yet to be quantified. The contempt order should be reversed for three main reasons.

***First***, the district court erroneously expanded the scope of the injunction to prohibit three categories of lawful conduct that had never been adjudicated as infringing. This conduct did not, and could not, violate the injunction, and it therefore cannot form the basis for a contempt sanction.

*De Minimis Copying of J.D. Edwards*. The district court held that Rimini violated the injunction's prohibition on "copying" the "software source code" of the J.D. Edwards program ("JDE") even though that "copying" was "*de minimis*" and "*de minimis* copying is not prohibited by the Copyright Act." Rimini was never held liable in the underlying litigation for *de minimis* copying; nor could it have been, as *de minimis* copying is "non-actionable." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021).

1

*PeopleSoft "Cross-Use."* Rimini was previously held liable for what Oracle has called "cross-use"—and what this Court has defined as the creation of generic development environments, not associated with any particular licensee, "under color of a license of one customer, to support other customers." *Oracle USA, Inc. v. Rimini St., Inc.*, 879 F.3d 948, 956 (9th Cir. 2018) (emphasis omitted). But Rimini fundamentally changed its processes in response to prior court rulings, and for several years has not engaged in this adjudicated conduct. Despite these facts, the district court found Rimini in contempt for acts associated with its *new* processes, which do not include the use of generic development environments, have never been adjudicated as infringing, and are the subject of separate, pending litigation.

*Copying of an Oracle Database File.* The district court erroneously held that Rimini "willfully" violated the injunction when a Rimini engineer opened an Oracle Database file sent to Rimini by a client, despite the fact that the injunction does not prohibit conduct permitted by an applicable license. *See Oracle USA, Inc. v. Rimini St., Inc.*, 783 F. App'x 707, 710-11 (9th Cir. 2019). And the unambiguous language of the relevant license agreement permits the client-licensee to use the software programs for internal business operations, including making necessary copies of the software, and allows agents and contractors of the licensee to assist in doing so. Rimini's conduct was licensed and therefore cannot have violated the injunction.

**Second**, the district court erred in refusing to apply *TiVo, Inc. v. EchoStar Corp.*, 646 F.3d 869 (Fed. Cir. 2011) (en banc), which prohibits contempt for conduct that is "more than colorably different" from the conduct previously adjudicated as infringing. This error requires reversal of the contempt order in its entirety. The district court acknowledged that "the situation" today is "strikingly different" from what was adjudicated in the first case, and admitted that key issues "ha[d] never been interpreted or decided by this Court" previously. The court nonetheless refused to apply the *TiVo* standard solely because *TiVo* was a "patent case," not a copyright case. That ignores the "historic kinship between patent law and copyright law." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984). The conduct for which Rimini was held in contempt should have been (and, indeed, *is*) the subject of a separate civil suit, not a contempt proceeding.

**Third**, the $630,000 sanction (along with a yet-to-be-determined amount of attorneys' fees and costs) does not satisfy the requirements of civil contempt and must therefore be vacated. It is black-letter law that coercive civil fines must be made payable to the court registry, not the other party (*e.g.*, *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986)), yet the district court ordered its contempt sanction payable to Oracle. And the sanctions cannot be recast as "compensatory" because they are not based on Oracle's "actual losses." *Id.* The district court's decision to use the statutory damages framework of the Copyright

3

Act is inconsistent with this Court's holdings and has been explicitly rejected by the Second Circuit. *See U2 Home Entm't, Inc. v. Wei Ping Yuan*, 245 F. App'x 28, 30 (2d Cir. 2007). Being neither civil coercive nor civil compensatory, the sanction has all the "hallmarks of punitive contempt": It is "retroactiv[e] and determina[te]" (*Parsons v. Ryan*, 949 F.3d 443, 456 (9th Cir. 2020)), and was imposed without any "opportunity [for Rimini] to purge" the sanction by taking action to remediate the issue (*NLRB v. Ironworkers Local 433*, 169 F.3d 1217, 1221 (9th Cir. 1999)). And because Rimini was not provided the protections of a jury trial and the proof-beyond-a-reasonable-doubt standard, the sanctions are unlawful. *Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 721 F.3d 1122, 1130 (9th Cir. 2013).

The contempt order should be reversed in its entirety; in the alternative, the sanctions must be vacated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1332, entered the operative permanent injunction (as later modified by this Court, *see Oracle*, 783 F. App'x at 711-12) on August 15, 2018 (3-ER-609-12), and retained jurisdiction to enforce the injunction in the matter now before the Court pursuant to 17 U.S.C. § 502(b). The final judgment of contempt issued on January 12, 2022 (1-ER-2-57), and Rimini timely filed its notice of appeal on February 7, 2022 (6-ER-1118). This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292.

## ISSUES PRESENTED

**I.** Whether the district court's contempt order must be reversed because: (A) the permanent injunction does not, and under the Copyright Act could not, prohibit *de minimis* copying; (B) the permanent injunction does not prohibit the conduct the district court labeled as "cross-use"; and (C) copying of Oracle Database files is permitted by the relevant license agreement.

**II.** Whether the contempt order must be reversed because the relevant conduct was more than colorably different from that adjudicated in *Rimini I*.

**III.** Whether the sanctions must be vacated because they are neither compensatory nor coercive, but rather are impermissibly punitive.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Pertinent constitutional and statutory provisions are located in the addendum to this brief. Cir. R. 28-2.7.

## STATEMENT OF THE CASE

This case arises out of a long-running commercial dispute between the two leading competitors in the market for enterprise software support services for Oracle software. It is undisputed that every Rimini client holds a valid software license from Oracle that allows it to contract with Rimini for support services (*Oracle*, 879 F.3d at 952 & n.1), and this Court has held expressly that Rimini operates "in lawful competition with Oracle's direct maintenance services" (*id.* at 952). This Court has

acknowledged that the provision of software support requires the copying of Oracle software files (*e.g.*, to open, view, modify, and run them) and that the relevant licenses permit such copying. *Id.* at 952-53, 956. What Oracle and Rimini have litigated for over a decade is whether the *manner* in which Rimini provides support exceeds the scope of the software licenses and/or infringes Oracle's copyrights.

## I.     Previous Litigation Regarding Enterprise Software Support.

Oracle licenses its enterprise software to customers for a "substantial one-time payment." *Oracle*, 879 F.3d at 952. The three products at issue here—PeopleSoft, JDE, and Oracle Database—are "designed to work across a large enterprise" by facilitating such tasks as "payroll, … ordering materials, shipping products, [and] dealing with customers." 5-ER-928-29. Oracle also offers software support contracts under which the company provides support services for the licensed software. 5-ER-923; 5-ER-934.

Rimini is Oracle's largest competitor for support services. Oracle "licensees may hire … Rimini to maintain their software for them," and "it is undisputed that the licenses generally permit Oracle's licensees to … outsource the work of maintenance to others, such as Rimini." *Oracle*, 879 F.3d at 956-57. Rimini has had thousands of such clients, including numerous Fortune 500 companies, universities, governments, and hospitals. 2-ER-333.

6

**A.** As relevant here, Oracle sued Rimini in 2010 ("*Rimini I*") for copyright infringement related to four Oracle software products—PeopleSoft, JDE, Siebel, and Oracle Database. 5-ER-1088-1111.

In *Rimini I*, Oracle accused the then-in-effect support processes Rimini used to service its clients, known as "Process 1.0." *See* 5-ER-1088-1111. Process 1.0 involved Rimini hosting and using "generic" Oracle software development environments on Rimini's local computer systems to develop and test software updates and fixes that were then delivered to Oracle-licensed clients to be placed in their "production" environments (the "live" version of the software running on the client's systems). 2-ER-295-97. Oracle referred to hosting environments on Rimini's systems as "local hosting," and it called the use of generic "development environments" to develop and test fixes and updates containing Oracle intellectual property "cross use." *See Oracle*, 879 F.3d at 956, 959. Among other things, Rimini asserted express license defenses to these claims. *See Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1086, 1093-99 (D. Nev. 2014).

Although every Rimini client had paid for Oracle software and held a valid license, and no client ever received any Oracle software to which it was not entitled under the applicable licenses, the district court held on summary judgment in 2014 that local hosting violated some PeopleSoft license agreements, which limited use of the PeopleSoft software to the licensee's "facilities." *Oracle*, 6 F. Supp. 3d at

7

1097-98. The court also held that the use of generic development environments not associated with a particular client to develop updates and fixes for multiple clients violated PeopleSoft license provisions limiting use of the software to the licensee's "internal data processing operations." *Id.*

The district court in 2014 similarly held that certain Siebel and JDE license agreements did not allow for the use of generic development environments to develop updates and fixes for multiple clients at once. *See Oracle*, 6 F. Supp. 3d at 1102-05; *see also Oracle*, 879 F.3d at 955. As to JDE, the court also held that the applicable licenses allow Rimini to make copies of the software on its computer system only to the extent necessary for the customer's archival needs and to support the customer's use—not to use the client's software to support other customers. *Oracle*, 6 F. Supp. 3d at 1103-04; 4-ER-869-70.

As to Oracle Database, the district court ruled that Rimini could not locally host or use generic development environments pursuant to the Oracle License and Service Agreement ("OLSA") because Rimini had downloaded Oracle Database from Oracle's website pursuant to a different developer license which imposed stricter use limits, and that alternatively, the OLSA would not permit Rimini's activities at issue there. *See Oracle USA, Inc. v. Rimini St., Inc.*, 6 F. Supp. 3d 1108, 1119-22 (D. Nev. 2014), *clarified by* 2014 WL 5285963 (D. Nev. Oct. 14, 2014).

**B.** In response to the district court's summary judgment rulings, Rimini invested millions of dollars to fundamentally revise its support processes to conform to the court's orders. 2-ER-107-08; 4-ER-641. The transition to "Process 2.0" was completed by the end of July 2014. 2-ER-298-99; *see also* 1-ER-62.



Under Process 2.0, as depicted above, each client hosts its own development (and other) environments on that client's own systems, which Rimini accesses *remotely* to provide support, and Rimini hosts no Oracle environments whatsoever. 2-ER-298-300. After transitioning to Process 2.0 (but before trial in *Rimini I*), Rimini filed suit for a declaratory judgment that Process 2.0 does not infringe Oracle's copyrights, a case known as "*Rimini II.*" *See Rimini St., Inc. v. Oracle Int'l Corp.*, No. 2:14-cv-01699-MMD-DJA (D. Nev. filed Oct. 15, 2014). Rimini moved to consolidate the two cases, but Oracle opposed that motion. 5-ER-982; 5-ER-999; 5-ER-1020. The district court sided with Oracle (5-ER-980) and later excluded all evidence of Process 2.0 from *Rimini I*, ruling that "Rimini's new service support

model is not relevant to any claim or issue in [*Rimini I*]" and that "all claims, issues, and evidence related to the new support model [Process 2.0] are being addressed solely in [*Rimini II*]." *Oracle USA, Inc. v. Rimini St., Inc.*, 2015 WL 5165374, at *2 (D. Nev. Sept. 3, 2015).

**C.** *Rimini I* went to trial in September 2015. Oracle argued that Rimini had engaged in willful copyright infringement, asserted several intentional interference theories, and sought compensatory and punitive damages totaling over $245 million. 5-ER-947-51. The jury found Rimini liable only for "innocent" infringement— meaning that Rimini "was not aware" and "had no reason to believe that its acts constituted" infringement.[1] 4-ER-834; 4-ER-885. Oracle sought nearly $200 million in lost profits alone, on a theory that Rimini's infringement caused customers to leave Oracle and to join Rimini (5-ER-961-63), but the jury found that Rimini's innocent infringement caused Oracle zero lost profits and earned Rimini zero additional profits. 4-ER-832; 4-ER-834. Instead, the jury assessed $35.6 million in damages on a hypothetical license theory. 4-ER-832. In post-trial proceedings, the district court granted Oracle's motions for a permanent injunction, prejudgment interest, attorneys' fees, costs, and other litigation expenses. 4-ER-664; 4-ER-686; 4-ER-720; 4-ER-796.

---

[1] The jury also found Rimini liable under two state anti-hacking statutes, but this Court reversed that verdict. *Oracle*, 879 F.3d at 961-62.

On appeal, this Court affirmed the judgment that Rimini was liable for locally hosting PeopleSoft environments (*Oracle*, 879 F.3d at 959-60 & n.6) and engaging in "cross use" of JDE and Siebel software—that is, "the creation of development environments, under color of a license of one customer, to support other customers" (*id.* at 956 (emphasis omitted)). As to Oracle Database, the Court affirmed liability on the procedural ground that Rimini had waived appellate challenge to the district court's finding that the OLSA did not apply. *Id.* at 953 n.2, 960. Finally, the Court sustained the fees and costs award in part but vacated the permanent injunction and remanded after reversing state law claims. *Id.* at 964-65. This Court's decision on "costs" was reversed by the Supreme Court. *See Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873 (2019).

**D.** On remand, the district court granted Oracle's motion for a renewed permanent injunction. 3-ER-629. Rimini appealed again, and this Court struck two provisions as overbroad: the injunction wrongly "restrict[ed] 'local hosting' for the [JDE] and Siebel licenses" because the "licenses do not contain such a limitation"; and the injunction also wrongly prohibited "access[ing] [JDE] source code" because "accessing" is not infringement under the Copyright Act. *Oracle*, 783 F. App'x at 710-11. The Court otherwise upheld the injunction. *See id.* at 710-12.

## II.   The Contempt Proceeding.

**A.**  In February 2019, Oracle sought permission from the district court to conduct discovery into Rimini's compliance with the permanent injunction.  3-ER-589.  The court granted Oracle's motion, and after nearly eighteen months of discovery—during which Rimini produced nearly one million documents concerning thousands of updates, and Oracle had live, 24/7 access to Rimini systems—Oracle moved for an order to show cause as to why Rimini should not be held in contempt.  3-ER-552.

Oracle posited a sweeping theory of contempt, accusing essentially every aspect of Process 2.0—which had never been litigated and had been deferred (at *Oracle's* insistence) for *Rimini II*—of violating the permanent injunction.  3-ER-568-84.  Specifically, in accusing Rimini's entire "process" related to PeopleSoft, JDE, and Oracle Database of violating the injunction, Oracle called out the following as violating various provisions of the injunction: (i) the "prototype/retrofit support service model"; (ii) use of "Dev Instructions" to guide Rimini's own development work; (iii) "AFW Tools software"; (iv) reliance on cloud storage by clients; (v) creation and use of "test cases"; (vi) development of updates and modifications under Process 2.0; (vii) increased efficiency in developing updates; and (viii) copying of Oracle Database.  *See* 1-ER-72-85; *see also* 3-ER-568-84.  Oracle

asked the district court to hold Rimini in contempt for these practices and processes, even though none of them had been adjudicated in *Rimini I.*

The district court rejected Oracle's attempts to sweep in Rimini's new processes via contempt. The court emphasized that "the injunction does not enjoin conduct that has yet to be adjudicated unlawful," and that Rimini cannot be held "in contempt for conduct not yet adjudicated in *Rimini II*." *Oracle USA, Inc. v. Rimini St., Inc.*, 2021 WL 1224904, at *6-7 (D. Nev. Mar. 31, 2021). And with regard to a number of issues, the court found that Oracle had not met its burden as a matter of law. *Id.* at *9-17.

But the district court nonetheless identified ten discrete issues that raised questions of fact that required an evidentiary hearing, grouped below by relevant software product line and accused conduct.

**PeopleSoft Files on Rimini's Systems.** Oracle accused Rimini of violating the injunction because a handful of individual PeopleSoft files were found on Rimini's systems, which had been emailed or uploaded by Rimini's clients to Rimini's computer systems. Rimini, at all relevant times, had clear internal policies that forbade Oracle files from being present on Rimini's computer systems, and it made repeated warnings to clients *not* to email or upload any such files. 2-ER-123-31; 2-ER-323-25; 2-ER-339-40. But despite these policies and warnings, some clients emailed PeopleSoft files to Rimini or uploaded them to Rimini's computer

systems, and Oracle accused Rimini of contempt when its engineers opened those files from clients. 1-ER-8-20. Oracle also accused a Rimini-written file called "rspcmpay.cbl" on Rimini's systems that the parties disputed contained any protected Oracle expression. 1-ER-77-79; 3-ER-349.

**PeopleSoft "Cross-Use."** Oracle accused a Rimini-written file called "rsi940a.sqr," which was tested in client City of Eugene's environment and ultimately delivered to clients Matheson Trucking, Spherion, and Smead. 1-ER-76-77; *see also* 1-ER-20-25. In its order to show cause, the district court held that Rimini violated the injunction as to Matheson, reserving the question of contempt and any sanctions for the hearing, along with the issue of the development and implementation of the same update for Spherion and Smead. 1-ER-83-84. The court also identified a print parameter error in an IRS W-2 form (a PDF file containing no Oracle expression whatsoever) that Rimini fixed in City of Eugene's environment and later implemented the same fix for client Johnson Controls. 1-ER-27-31; 1-ER-76-77; 3-ER-349. And the court ordered Rimini to show cause as to an entirely Rimini-written file called "rsiqtrtx.sqr" that was developed for and sent to clients Rockefeller Group and Home Shopping Network, which Oracle accused as "cross-use." 1-ER-84; 3-ER-351.

**Copying JDE Software Source Code.** The district court ordered the parties to address the question whether Rimini could copy any J.D. Edwards "source code"

(1-ER-82), even just by opening a J.D. Edwards software file on a client's systems. The court also set for hearing the issue whether Rimini could include in Rimini's internal Technical Design Specification documents "snippets" of JDE code as markers to indicate to Rimini engineers where to insert Rimini-written code into the JDE program when working remotely on a client's environment. 1-ER-82; 3-ER-351.

**Derivative Works.** The district court asked whether two entirely Rimini-written files ("rsi1099i.sqr" and "rsi1099m.sqr") were derivative works of Oracle software merely because, while it was undisputed that they contained no literal or non-literal Oracle expression, they were intended to run only with Oracle programs. 1-ER-36-42; 3-ER-349.

**Copying of an Oracle Database File.** Finally, the court considered whether a single Oracle Database file a client sent to Rimini violated the injunction when the Rimini engineer opened the file (thus creating a copy in computer memory). *See* 1-ER-48-50.

**B.** Following the evidentiary hearing, the district court issued findings of fact and conclusions of law. 1-ER-2-57.

The district court "recognize[d] that Rimini has taken steps in an attempt to comply with the Court's Order." 1-ER-19. Specifically, the court acknowledged Rimini's actions in migrating all client environments off of its systems, maintaining

15

an Acceptable Use Policy prohibiting Oracle files from being on its systems, providing ongoing training to Rimini's thousands of employees on the Acceptable Use Policy, implementing technical measures to keep Oracle files off of Rimini's systems, quarantining potential Oracle files that do reach Rimini's systems, educating clients about Rimini's policies during onboarding training, and providing written warnings to clients "not [to] upload any third-party software … or any other third party intellectual property" to Rimini's systems. 1-ER-17; *see* 2-ER-115-18; 2-ER-120-32; 2-ER-136-43; 2-ER-145-47; 2-ER-149-50; 2-ER-155; 2-ER-188-89; 2-ER-232-33; 2-ER-237-39; 2-ER-262; 2-ER-298-301; 2-ER-324-26; 8-ER-1544; 8-ER-1573; 8-ER-1559.

But the district court nonetheless found Rimini in contempt for violating the injunction. Of the ten discrete issues the court included in its order to show cause, the court dismissed five of them as non-contumacious and found Rimini in contempt on five of them:

**PeopleSoft Files on Rimini's Systems.** The court found that while Rimini clients had sent a handful of PeopleSoft files to Rimini in contravention of its Acceptable Use Policy, Rimini violated the injunction, at times willfully, when engineers and other employees opened or forwarded the messages containing those files, thus creating a copy on Rimini's systems. 1-ER-18-20.

**PeopleSoft "Cross-Use."** The Court found that Rimini "essentially" "cross used" the development environment of one client (City of Eugene) to "determine what change was needed" and to test a change that was implemented for clients Matheson, Spherion, and Smead, even though each client's Oracle software environment remained separate and siloed on that client's own systems, and no Oracle software was ever intermingled. 1-ER-26-27. The court found this to be a willful violation of the injunction. 1-ER-27.

**Copying JDE Software Source Code.** The court found that whether Rimini could copy JDE source code pursuant to a license provision had never been decided and was a live question in *Rimini II*. Thus, the court discharged that issue. 1-ER-47. However, the court then held that while the copying of JDE source code "snippets" in Rimini's Technical Design Specification documents was *de minimis* and not prohibited by the Copyright Act, Rimini had nevertheless violated the injunction by making such *de minimis* copies, and that future *de minimis* copying would constitute willful violations subject to "sanctions of the highest order." 1-ER-48.

**Derivative Works.** The district court held that even though there was no dispute that certain files at issue "contain no Oracle code" (1-ER-38) and no other Oracle protected expression whatsoever, literal or non-literal, under its prior ruling

in *Rimini II*, the accused files appeared to be derivative works merely because they can only be run with Oracle software.  1-ER-41-42.[2]

**Copying of an Oracle Database File.**  The court found that a Rimini engineer willfully violated the injunction by opening an Oracle Database file sent to the engineer by a client.  1-ER-49-50.  Although the court recognized that this conduct was "strikingly" different from what was litigated in *Rimini I*, that the client held a valid license, and that Rimini was using the file solely for the client's internal business operations as per the license, the court held that the license did not permit Rimini to make *any* copies—only the licensee could.  1-ER-50.

**C.**  For Rimini's contumacious violation of the injunction, the district court ordered Rimini to pay Oracle $630,000 in non-dischargeable sanctions—$100,000 per willful violation and $30,000 per non-willful violation—based on the Copyright Act's statutory damages provision, 17 U.S.C. § 504(c)(1)-(2).  1-ER-55-56.  The court also imposed an additional "sanction" of "attorney's fees and costs" in an amount to be determined following this appeal.  1-ER-56.  The court found "that this sizable statutory sanction, and what the Court anticipates will be sizable attorney's

---

[2]    Because the files Oracle accused as derivative works are Rimini-written and contain no Oracle protected expression, the interim ruling in *Rimini II* that these such files may nonetheless be "derivative works" is contrary to this Court's precedents. *See Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965 (9th Cir. 1992). Nevertheless, the district court's contempt order made clear that it was reserving that question for final decision in *Rimini II*.  1-ER-41.

fees and costs, serves to not only compensate Oracle for Rimini's contemptuous behavior, but also compel Rimini to comply with the Court's Orders and abide by the [injunction] going forward." 1-ER-56.

The district court made no findings about any harm or loss to Oracle, and did not connect the sanctions awarded to any such harm. 1-ER-54-57. Indeed, Oracle did not submit any evidence of any harm from the conduct it accused or the conduct for which Rimini was found in contempt. Following Rimini's notice of appeal, the district court *sua sponte* stayed calculation of attorneys' fees and costs pending resolution of the appeal. 2-ER-96-97.

## SUMMARY OF THE ARGUMENT

**I.** The district court erred in expanding the permanent injunction to reach lawful conduct that was not previously adjudicated as infringing.

**A.** The district court expanded the injunction to prohibit lawful *de minimis* copying of JDE code in an internally inconsistent contempt order. The district court correctly held that the inclusion of "snippets" of code in Rimini technical documents was "*de minimis*" and that "*de minimis* copying is not prohibited by the Copyright Act." 1-ER-48. But the court nonetheless held that such copying violates the injunction. 1-ER-47-48. This was clear legal error. Indeed, this Court already *struck* a provision of the injunction that barred conduct that was "not an infringing activity under the Copyright Act." *Oracle*, 783 F. App'x at 711. The court's order

was internally inconsistent, holding in one paragraph that Rimini was permitted to copy JDE code, yet in the next paragraph holding that *de minimis* copying of that code was prohibited. Those holdings are irreconcilable, and the internal inconsistency of the contempt order alone is reason to reverse.

**B.** The district court erred in expanding the injunction to cover an entirely new concept of "cross-use" for PeopleSoft software that had never been adjudicated, let alone accepted as a viable infringement theory. The injunction followed the jury's decision to hold Rimini liable for the creation of generic development environments on Rimini's systems that were then used to service multiple licensees. But Rimini ceased that conduct in 2014. The district court here *expanded* the injunction beyond what was adjudicated in *Rimini I* to hold Rimini in willful contempt for entirely different and lawful conduct, which created an unworkable standard and severely threatens legitimate competition.

**C.** The district court also erred in holding that Rimini willfully violated the injunction's prohibition on copying Oracle Database. The injunction does not (and could not) prohibit conduct permitted by the license agreements. *See Oracle*, 783 F. App'x at 710-11. The unambiguous language of the Oracle Database license provides the licensee with the right to "allow [its] agents and contractors … to use the programs" for the client's licensed purposes, which includes making "copies" for internal business operations. The district court erred in finding Rimini in

20

contempt for copying an Oracle Database file when a Rimini engineer opened a file on behalf of an Oracle licensee solely for that licensee's internal business operations.

**II.** The accused conduct was "more than colorably different" from the conduct for which Rimini was found liable in *Rimini I*, and thus should not have been litigated in the contempt proceeding at all. *See TiVo*, 646 F.3d at 882-83. The court's sole reason for refusing to apply *TiVo* was that it is a "patent case," which erroneously ignored the long-standing kinship of patent and copyright law. If the Court had applied *TiVo*, it could not have held Rimini in contempt.

**III.** The district court's $630,000 fine, as well as a yet-to-be-determined amount of attorneys' fees and costs, fail the standards for appropriate civil contempt sanctions. The $630,000 fine cannot be coercive because it was made payable *to Oracle*. The fine also cannot be compensatory because it is not based on Oracle's "actual losses." Being neither civil coercive nor compensatory, the $630,000 fine is unquestionably *punitive*—retroactive, fully determinative, and imposed without any opportunity for discharge. Because Rimini did not receive the procedural protections for a criminal contempt sanction (*e.g.*, a jury trial and proof beyond a reasonable doubt), the fine must be vacated. The attorneys' fees and costs sanction is similarly defective.

## STANDARDS OF REVIEW

Courts "review the district court's decision to hold [a party] in contempt under the abuse of discretion standard." *United States v. Washington*, 761 F.2d 1419, 1421 (9th Cir. 1985). "The interpretation of an injunction and its application to undisputed facts is, however, a question of law subject to *de novo* review." *Id.* Contracts and licenses are similarly interpreted *de novo*. *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1041 (9th Cir. 2020). Underlying factual findings, including findings of willfulness, are reviewed for clear error. *Dolman v. Agee*, 157 F.3d 708, 715 (9th Cir. 1998). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Miller v. United States*, 587 F.2d 991, 994 (9th Cir. 1978). But because contempt is an "inherent power" "shielded from direct democratic controls," courts have long recognized that it "must be exercised with restraint" (*United States v. U.S. Dist. Ct. for N. Mariana Islands*, 694 F.3d 1051, 1059 (9th Cir. 2012) (quotation marks omitted)), and that "review of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." *E.g.*, *Hester Indus., Inc. v. Tyson Foods, Inc.*, 160 F.3d 911, 916 (2d Cir. 1998).

## ARGUMENT

### I. The District Court Erred in Construing the Permanent Injunction to Cover Lawful Conduct Not Adjudicated in *Rimini I*.

Three of the categories of conduct for which Rimini was held in willful contempt do not, and could not, violate the injunction. The district court thus erred in: (A) construing the permanent injunction to cover lawful *de minimis* copying; (B) adopting an erroneous conception of "cross-use" that was never adjudicated; and (C) forbidding copying of Oracle Database plainly permitted under the license.

#### A. The District Court Erred in Holding That *De Minimis* Copying Violated the Permanent Injunction.

The ancient principle *de minimis non curat lex*—"the law does not concern itself with trifles" (*Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004))—is foundational to our law. *See St. Clair Cnty. v. Lovingston*, 90 U.S. 46, 66-67 (1874); 2 William Blackstone, Commentaries *262; J. Inst. 2.1.20. And the doctrine is, and always has been, integral to copyright law in particular. *See, e.g., Sony*, 464 U.S. at 451 n.34; *Knickerbocker Toy Co., Inc. v. Azrak-Hamway Int'l, Inc.*, 668 F.2d 699, 703 (2d Cir. 1982); *Webb v. Powers*, 29 F. Cas. 511, 519 (C.C.D. Mass. 1847) (Woodbury, Circuit J.).

As a result, copying that is *de minimis* is not a "copy" at all within the meaning of the Copyright Act and therefore is "non-actionable." *Bell*, 12 F.4th at 1074. The

23

district court erred in holding that Rimini violated the injunction for making what the court itself acknowledged were lawful *de minimis* copies.

### 1. The "Snippets" of Oracle Code in Rimini's JDE Technical Design Specifications Were *De Minimis*.

The district court held that "snippets of Oracle source code" (1-ER-47), in Rimini's JDE Technical Design Specification documents "are *de minimis*," and that "*de minimis* copying is not prohibited by the Copyright Act" (1-ER-48 (citing *Newton*, 338 F.3d at 1193)). Both conclusions were correct.

A Technical Design Specification is a Rimini-created internal document used by a software engineer to guide development work in a client's licensed JDE software environment on that client's systems. The document "describes the changes that are going to be made" to the software to update it (2-ER-162-63), and is comprised of Rimini-written expression, including many pages of "code written by … Rimini engineer[s]" (2-ER-163). That Rimini code contains no Oracle expression (literal or non-literal) whatsoever (*see* 2-ER-167; 2-ER-283-84) and "add[s] … functionality" that Rimini's clients have contracted with Rimini to provide (as they are entitled to do under their Oracle licenses) (2-ER-163).

The Rimini Technical Design Specification at issue here (8-ER-1664; 8-ER-1689) contained Rimini-written code surrounded by boxes. The accused "snippets" of Oracle code are certain characters *above* the boxes, highlighted below in yellow:

24

```
VArpt_mnOrigRoth457b............TH01="0"
Math N.........c To String
```

```
// Begin RS18JDEUSP09
VA rpt_mnCorrEquity83i_MATH01 = "0"
Math Numeric To String
    VA rpt_mnCorrEquity83i_MATH01 -> BF MathNumeric
    "N" -> BF cIncludeSign
    "9.00" -> BF mnBeforeDecimalPoint
    "N" -> BF cIncludeDecimalPoint
    "2.00" -> BF mnAfterDecimalPoint
    OC Corr Qual Equity Grant 83i (RCO)<- BF szString
//
VA rpt_mnOrigEquity83i_MATH01= "0"
Math Numeric To String
    VA rpt_mnOrigEquity83i_MATH01-> BF mnMathNumeric
    "N" -> BF cIncludeSign
    "9.00" -> BF mnBeforeDecimalPoint
    "N" -> BF cIncludeDecimalPoint
    "2.00" -> BF mnAfterDecimalPoint
    OC Orig Qual Equity Grant 83i (RCO) <- BF szString
// End RS18JDEUSP09                                          ADD
```

** Add code lines before the "If $CT3 <> $T3 OR" conditional block **

```
*       Qualified Equity Grants Under Section 83(i)
B1              If      $OQualEqGrant <> $OQualEqGrant5
                Move    $OQualEqGrant            $COQualEqGrant
                Move    $OQualEqGrant5           $OOQualEqGrant
                Add     $OQualEqGrant            #COQualEqGrant
                Add     $OQualEqGrant5           #OOQualEqGrant
E1              Endif

*       Aggregate Deferrals Under Section 83(i)
B1              If      $OAggDef83i <> $OAggDef83i5
                Move    $OAggDef83i              $COAggDef83i
                Move    $OAggDef83i5             $OOAggDef83i
                Add     $OAggDef83i              #COAggDef83i
                Add     $OAggDef83i5             #OOAggDef83i
E1              Endif                                        ADD
```

8-ER-1664; 8-ER-1689. The ellipses in the snippets are not from Oracle's program, but were placed there by Rimini engineers to *avoid* reproducing Oracle code. 2-ER-165. And it is undisputed that the non-elided characters are merely "markers," or "snippets" a developer uses once logged into the client's environment to know where to place the Rimini-written code into the Oracle program. 2-ER-164-65; 2-ER-281-

82; 2-ER-312-13.  These accused characters are "inert" because, as the district court found, they "are not complete lines of code and cannot be run or executed on their own."  1-ER-46; *see also* 2-ER-165; 2-ER-282.  And it is undisputed that these snippets are miniscule when compared to the roughly 13,000 lines of code in the file from which they originated.  2-ER-283.

The district court thus correctly held that such snippets are qualitatively and quantitatively *de minimis*.  1-ER-48; *see Newton*, 388 F.3d at 1193.

> ### 2. The District Court Erroneously Held That *De Minimis* Copying Violated the Injunction.

Despite acknowledging that the Copyright Act permits *de minimis* copying, the district court nonetheless concluded that this *de minimis* copying violated paragraph 8 of the permanent injunction, which reads:  "Rimini Street shall not copy J.D. Edwards software source code to carry out development and testing of software updates."  1-ER-47-48.  Although the district court did not hold Rimini in contempt for this conduct, the court was clear that the copying did violate the injunction and that future copying would be willfully contumacious.  1-ER-48.  The district court held:

> The Court now makes clear that Rimini is not permitted to copy even snippets or partial segments of Oracle source code into a Technical Design Specification document. Future copying of this nature will result in the Court finding Rimini willfully violated the Permanent Injunction and sanctions of the highest order.

1-ER-48.

The district court erred by interpreting the injunction to prohibit lawful acts not prohibited by the Copyright Act and never previously adjudicated.

Lawful acts not prohibited by the Copyright Act are not and cannot be prohibited by the injunction. *See Oracle*, 783 F. App'x at 710-11. The injunction was issued pursuant to the Copyright Act (3-ER-617), which authorizes the district court to issue injunctions "to prevent or restrain infringement of a copyright" (17 U.S.C. § 502(a)). And the district court was emphatic, stating no fewer than six times in its Order to Show Cause that: "The Court has made clear that the permanent injunction enjoins *unlawful*, infringing conduct" that had already been adjudicated as such and affirmed on appeal. 1-ER-80; *see also* 1-ER-67-68; 1-ER-77; 1-ER-83.

Indeed, this Court has previously reversed the district court for attempting to enjoin conduct that the copyright law permits. *See Oracle*, 783 F. App'x at 711. In a previous appeal, Rimini argued that a provision in the JDE section of this injunction was overbroad because it purported to enjoin "access" to JDE "source code." *Id.* at 710-11. This Court "agree[d]," holding that this "prohibition on 'access[ing]' source code is overbroad" because "[*a*]*ccessing a copyrighted work is not an infringing activity under the Copyright Act*," and striking the provision from the injunction. *Id.* (emphasis added). Similarly, the Court struck a provision from the injunction that purported to impose a "facilities" limitation on making copies of

27

JDE and Siebel software because the license agreements contained no such limitation. *Id.*

Excluding lawful *de minimis* copying from the injunction's scope makes perfect sense given the animating purpose of the Copyright Clause of the Constitution and the Copyright Act. The *de minimis* copies promote the common good by ensuring "public access" to copyrighted works and spurring further innovation. *Sony*, 464 U.S. at 429; *see also* U.S. Const. art. I, § 8, cl. 8. Rimini's Technical Design Specifications consist of *Rimini*'s protected expression—pages and pages of Rimini-written code—that is meant to innovate and add functionality to Oracle programs held by Oracle's licensees. The *de minimis* copying of Oracle code at issue undisputedly serves the single, and important, purpose of telling the Rimini engineer *where* to put Rimini's code within the Oracle program. 2-ER-164-65; 2-ER-281-82; 2-ER-308; 2-ER-312-13. Allowing such *de minimis* copying serves the purposes of copyright: ensuring continued access and use of Oracle programs by licensees and promoting innovation.

This "important aspect of the law of copyright" facilitates access to copyrighted works. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 173 (2d Cir. 2001). To affirm the district court's ruling here and transform Rimini's lawful *de minimis* copying into *willful disobedience of a court order* turns the policies of copyright on their head. *See Norse v. Henry Holt & Co.*, 991 F.2d 563, 566 (9th Cir. 1993)

28

(restricting *de minimis* copying "would stifle the very creativity which [copyright] law is designed to foster") (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).

The district court's order on this point is also internally inconsistent, which alone is reason to reverse. *See United States v. Holden*, 908 F.3d 395, 404 (9th Cir. 2018) ("internally inconsistent" order from district court was abuse of discretion); *cf. Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015) ("an internally inconsistent analysis is arbitrary and capricious" and "an abuse of discretion"); *United States v. AT&T, Inc.*, 916 F.3d 1029, 1033 (D.C. Cir. 2019).

The district court emphasized (correctly) numerous times that the injunction covers "*only* acts that had already been determined unlawful and that had been affirmed on appeal." *E.g.*, 1-ER-5 (emphasis added). The district court even refused to hold Rimini in contempt for any and all copying of JDE "source code" *precisely because* that conduct had not been previously adjudicated. 1-ER-46-47.

Yet in the very next paragraph, the district court inexplicably (and incorrectly) held that Rimini violated paragraph 8 of the injunction by engaging in *de minimis* copying of JDE "software source code" in the Technical Design Specification. 1-ER-46-47. Having acknowledged that the lawfulness of simply copying JDE source code has never been decided in this case, it defies logic to hold Rimini in contempt for doing simply that—especially where that copying was *de minimis* and therefore

not a violation of the Copyright Act. The court's holding was error. *See Holden*, 908 F.3d at 404 (vacating "internally inconsistent" order).

## B. The District Court Erred in Expanding the Permanent Injunction's Prohibition on "Cross-Use."

The district court improperly expanded the scope of what the injunction prohibits as "cross-use" to hold Rimini in contempt for conduct that was not adjudicated in *Rimini I* and is authorized by the software licenses.

### 1. Rimini Did Not Engage in, and Oracle Did Not Accuse, the "Cross-Use" Adjudicated in *Rimini I*.

Paragraphs 4 and 6 of the permanent injunction provide that Rimini "shall not reproduce, prepare derivative works from, or use a specific licensee's PeopleSoft software or documentation other than to support the specific licensee's own internal data processing operations" and "shall not use a specific licensee's PeopleSoft environment to develop or test software updates or modifications for the benefit of any other licensee." 3-ER-610. These provisions were drafted by Oracle following *Rimini I*, in order to prohibit what had been previously adjudicated as infringing. 1-ER-5.

In *Rimini I*, Rimini was found liable for hosting generic development environments on Rimini's own computer systems, which were then used to support multiple clients at once, rather than supporting each client in the client's own licensed development environment on the client's own systems. *See Oracle*, 879

F.3d at 955-60; *Oracle*, 6 F. Supp. 3d at 1092; *see also* 1-ER-25-27. This Court, in turn, defined "cross-use" in the first appeal in *Rimini I* as "the creation of development environments, under color of a license of one customer, to support other customers." *Oracle*, 879 F.3d at 956 (emphasis omitted); *see also id.* at 957.

But that conduct ceased long ago. Oracle did not accuse in this contempt proceeding any of the conduct that was adjudicated in *Rimini I*. And for good reason. Under Process 2.0, Rimini eliminated the use of generic development environments and the local hosting of development environments on Rimini's systems. 2-ER-298-99. Rimini completed the transition to Process 2.0 by the end of July 2014—years before the injunction became effective. 4-ER-641-42; 4-ER-752-53. Under Process 2.0, each Rimini client now has its own unique, siloed development environment, stored only on that client's own systems, which Rimini may only access remotely to develop and test fixes and updates using only that client's Oracle software. 2-ER-298-99; 4-ER-793-94. Oracle presented no evidence to the contrary at any time.

### 2. The Conduct for Which Rimini Was Found in Contempt Was Never Previously Adjudicated as Infringing.

The district court erred by holding that entirely *different conduct* by Rimini engineers in a few isolated instances constituted "cross-use" in violation of paragraphs 4 and 6 of the injunction. Across the tens of thousands of updates and fixes performed by Rimini engineers for Rimini clients during the nearly three years in which the injunction has been in effect (2-ER-252; *see also* 2-ER-338), the district

31

court found that Rimini engineers engaged in what it called "cross-use" with regard to only *two* such updates. It was wrong for the district court to find that Rimini was not in "substantial compliance" with the injunction, and more fundamentally, the conduct for which the court held Rimini in contempt does not bear even a passing resemblance to the use of generic development environments that was adjudicated in *Rimini I*. The court thus erroneously expanded the injunction.

**i. The rsi940a.sqr File.** Rimini engineers authored a file called "rsi940a.sqr," which contains no Oracle code or protected expression. 1-ER-20; 2-ER-180-81; 2-ER-205; 2-ER-208. The file relates to the IRS tax Form 940, Schedule A, a form the IRS updates every year, thus generally requiring Rimini to update rsi940a.sqr (and related files) every year or so. *See* 1-ER-20-21; 2-ER-205. HCM200049 was such an update, because the IRS Form 940A had changed slightly in tax year 2018. 2-ER-204-05.

Rimini's client, City of Eugene, had a valid license agreement with Oracle. 8-ER-1574-93. City of Eugene contracted with Rimini for support services, and under that contract, Rimini was obligated to provide City of Eugene software updates related to any federal tax form changes. 8-ER-1589-91. Per that contract, City of Eugene had received rsi940a.sqr updates *every year* it was a Rimini client leading up to 2019. 2-ER-215-16; *see also* 8-ER-1574-75; 8-ER-1593. Unsurprisingly, then, as the district court found, Rimini engineers contemplated as

early as July 2018 that City of Eugene would receive the next update because the 2018 tax form updates would need to be delivered to all U.S. clients that had not previously received a particular Oracle package called "2018-B," and City of Eugene was undisputedly in that group. 1-ER-21; 2-ER-215.

In early January 2019, before HCM200049 had been provided to any clients and before development of the update had begun, Spherion, another Rimini client, reported it was having issues printing to the new 940A form. 1-ER-21; 2-ER-213. On January 15, 2019, a Rimini business analyst changed the scope of the update in Rimini's development tracking software "Jira," which had since July 2018 been set as "INCL: US" (which meant all U.S. clients) (1-ER-21; 2-ER-213), to "SPH", meaning Spherion, to reflect that Spherion had reported an issue—not that Spherion would be the only client that needed the annual update. 1-ER-21; 2-ER-214. Rimini engineers began developing the annual update to Rimini's rsi940a.sqr file (HCM200049) on Rimini's own systems, and tested it in City of Eugene's environment—one of numerous U.S. clients slated to receive the update—on or about January 24 or 25, 2019. 1-ER-22; 2-ER-213; 2-ER-215-16; 8-ER-1624-25. Rimini subsequently sent the updated rsi940a.sqr and related files, and performed what is called "informal delivery" of the update for three clients that had in that time period affirmatively requested the update—Spherion, Smead, and Matheson Trucking. *See* 2-ER-242; 2-ER-246-47; 2-ER-257. Rimini formally delivered the

update to Smead and Matheson Trucking later (which included further testing), but did not do so for Spherion because Spherion ceased Rimini support before formal delivery. 2-ER-223-24; 2-ER-247.

On January 29, 2019, *after* testing HCM200049 in City of Eugene's environment, Rimini's business analysts determined that, unlike previous years, the annual update to rsi940a.sqr would not need to go to all U.S. clients. That was because that year, IRS Form 940 would be needed only for those clients doing business in the Virgin Islands. 2-ER-225; 2-ER-227; *see also* 8-ER-1618; 8-ER-1623-25. On February 26, 2019, the scope in Jira reflected that the update was due to only four Rimini clients (those that had such business)—a group that did not include City of Eugene. 1-ER-24.

Oracle claimed that because City of Eugene *ultimately* did not need the update that was tested in its environment, the copies made in connection with that testing were not for City of Eugene's benefit, and were therefore infringing. Oracle called this "cross-use"—the same term it used in *Rimini I* to refer to Rimini's use of generic environments on Rimini's systems.

But as discussed further below, this conduct is not infringing. And it certainly is not "cross-use" as that concept was adjudicated in *Rimini I*. It was reversible error for the district court to expand the injunction to cover this conduct that is not infringing, and certainly had never been adjudicated as infringing in *Rimini I*.

**ii. The W-2 Print Box Fix.**  The same is true regarding the district court's "cross-use" ruling for the W-2 fix.  On January 23, 2019, Rimini client Johnson Controls ("JHN") reported that text was being cut off when it printed its data in Box 14 of the federal W-2 tax form.  1-ER-27.  Rimini believed this bug "potentially affected many clients" using the form because Rimini had recently updated W-2 printing functionality for many clients, and Rimini even worried that it might have introduced the bug (although it turned out it did not).  2-ER-194-95; *see also* 2-ER-174-76; 2-ER-198-200; 8-ER-1599.  One of those potentially affected clients was City of Eugene, which, as noted earlier, received U.S. federal form updates under its contract with Rimini.  *See* 2-ER-198-99; 8-ER-1589; 8-ER-1593.  Rimini's fix involved two steps.

*First*, Rimini edited an Adobe PDF template of the W-2 form (8-ER-1617) to reduce the font size so that the full values would print within the borders of the box, and delivered it to JHN (1-ER-27).  This change did not involve any Oracle software or code, and Oracle does not allege this conduct violated the injunction.  1-ER-27.

*Second*, after JHN reported that it no longer experienced the Box 14 problem, but that Box 17 was printing incorrectly, a Rimini engineer reached out to his colleagues inquiring whether "reducing the pic size on the Print parameters for XMLP" would solve the problem.  1-ER-27-28.  The engineer then emailed his colleague, saying:  "The XMLP print parameters for Box 17 are blank.  So where is

the format for the numbers being picked up?" 1-ER-28. That colleague instructed the engineer to have JHN enter a particular formatting code ("B999999.99") in the Print Format box, noting that he believed this solution would work because he "tested it" "on [City of Eugene's]" environment. 1-ER-28. Rimini implemented the bug fix to Box 17 by calling JHN and instructing them how to change the print parameters on their own systems, which fixed the issue. 1-ER-28. Rimini delivered the fix to other clients "the following tax year" because, as it turned out, "although this was a bug that needed to be addressed for [Rimini's] clients, the symptoms" appeared only when there was a certain data configuration in the client's environment, as JHN had experienced. 2-ER-200-01.

Oracle claimed that even though no Oracle expression was being copied, Rimini engineers' re-use of knowledge, experience, and work product gained from servicing the *initial* client on similar work for *future* clients constituted impermissible "cross-use." But, again, and as discussed below, such re-use of knowledge is not copyright infringement, had not been previously adjudicated as infringing in this case, and cannot be the basis for a contempt finding.

### 3. The "Cross-Use" for Which Rimini Was Found in Contempt Is Licensed and Non-Infringing.

What the district court has now called "cross-use" is authorized by the relevant license agreements and required by Rimini's clients' contracts. It does not infringe Oracle's copyrights, nor violate the injunction.

It is undisputed that each of the clients at issue here—City of Eugene, Matheson Trucking, Spherion, Smead, and Johnson Controls—paid for and held a valid license agreement, under which the client is permitted to "provide access to and use of the Software" to "third parties[.]" 8-ER-1716; *see also* 8-ER-1706; 8-ER-1747; 8-ER-1765; 8-ER-1775. Consistent with these licenses, each client is "clearly allowed to develop and test updates for" PeopleSoft, and "to hire a third-party servicer, such as Rimini, to create these updates instead." 3-ER-509; *see* 8-ER-1703; 8-ER-1714; 8-ER-1744; 8-ER-1761; 8-ER-1767. Rimini is under contractual obligation to be "proactive" in providing "tax, legal, and regulatory updates" and "keep[ing] [the client] in compliance" with changes to governing law. 2-ER-289; *see also* 2-ER-292. Rimini had a contract with City of Eugene that *required* Rimini to provide updates to federal forms. 8-ER-1589-91; 2-ER-215-16. And it is undisputed that when two or more Rimini clients are affected by the same issue, Rimini can start development in either client's development environment. *See*, *e.g.*, 2-ER-269-70; 2-ER-276. Indeed, the district court has previously held that without violating the injunction, Rimini can "create the same update file" for more than one client (3-ER-544); "memorize" work product and "replicate the work" for more than one client (3-ER-544); re-use work product such as "test cases" (1-ER-76); "develop updates faster" and perform "less testing" (1-ER-73); "use the same tests to ensure functionality of an update" for more than one client (1-ER-76); and

"not test" "updates" that "had previously been tested and worked for other clients" (1-ER-83).

Accordingly, Rimini's work for the City of Eugene was for the City of Eugene's "internal data processing operations" (3-ER-440), and was performed in City of Eugene's undisputedly licensed environment on City of Eugene's systems (*see* 8-ER-1714; 2-ER-215-16; 2-ER-220). That should have been the end of the matter. The accident of history that in *that particular year* the City of Eugene wound up not needing the update *after* it had already been developed should be of no consequence, let alone serve as a bar to Rimini using what it learned (or a mandate that Rimini somehow forget what it had learned) in connection with supporting other clients.

The district court's ruling on "cross-use," however, fundamentally changes the copyright infringement standard from one focused on an objective application of the text of software licenses to an arbitrary inquiry into the subjective intent of a particular engineer. A person's subjective "intent" in making a copy is not relevant to whether that copy constitutes direct copyright infringement. *See*, *e.g.*, *Bell*, 12 F.4th at 1081; *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549-52 (4th Cir. 2004). The district court's ruling was error.

The district court's subjective intent standard is also impossible for engineers to comply with, and for courts to administer. Rimini engineers cannot always have subjective certainty at the outset about what software-related issues will impact clients in all cases. Rimini's contracts require it proactively to provide updates to clients on a quick timetable in response to various tax and regulatory changes (2-ER-289; *see also* 2-ER-292): It is inevitable that Rimini will sometimes begin work on an update for a client on the assumption that the client needs that work (based, for example, on the fact that the client has received an update to the same tax form in years past), and only later determine that assumption was wrong. But the work was done "for" the client pursuant to contract, even if the work was not ultimately needed—and that should end the inquiry. A rule that can retroactively turn this conduct into copyright infringement whenever it turns out a client for whom work is done did not actually need it—based on post-hoc analysis of whether a particular engineer had a subjectively reasonable basis for beginning work on an update at a particular time—simply has no basis in the Copyright Act and threatens to chill legitimate competition.

The district court's ruling, moreover, falls well short of the "clear and convincing" standard for contempt, let alone willful contempt. For instance, as to the rsi940a.sqr file, the district court speculated about the thought process of Rimini employee Laurie Gardner and her reasons for changing the Jira scope from "U.S."

to "SPH." 1-ER-21. The court appears to have thought that Ms. Gardner was aware of a November 2018 IRS advisory for Form 940A, which stated that the credit at issue would only apply to entities doing business in the Virgin Islands. 1-ER-21.

But the only evidence cited in support of that conclusion was that Ms. Gardner changed the Jira scope after Spherion reported the issue, in January 2019, and her email *after* development had occurred explaining that the update would be needed only for clients with workers in the Virgin Islands. 1-ER-21; 1-ER-24. Oracle never called Ms. Gardner as a witness or deposed her. *See*, *e.g.*, *United States v. Jordan*, 256 F.3d 922, 932 (9th Cir. 2001) ("clear and convincing" standard not necessarily met where the witness testimony supporting a factual finding was not "under oath subject to cross-examination"). Nor did Oracle establish that *anyone* at Rimini ever knew about the IRS advisory form. Indeed, *Rimini* witnesses testified that a "scope" change in Jira does not mean that *only* the particularly indicated client will receive an update; rather, the scope is changed to reflect the identity of the client for which the update is being worked on at the time. 2-ER-214-15.

As to the W-2 fix, the district court focused on a single email chain, again speculating about the subjective intent of an employee. Based on that email chain, the court held that the "record does not support a finding that Rimini believed other clients were impacted when it created the fix for Johnson Controls." 1-ER-29. But *at worst* the emails are equivocal, stating: "Looks like this could be a potential

40

problem for all new clients switching from tax960us [Oracle's file] to rsi960us who have left the formatting field blank," and "GPD – Please let me know after you scope if you think other clients could be impacted." 8-ER-1599; *see also* 8-ER-1594-95. That is hardly clear and convincing evidence that Rimini *knew* that City of Eugene would not need the W-2 fix. Moreover, while the district court found that "Rimini did not deliver this fix to any other client, including the City of Eugene," the court conceded the opposite in a footnote—that "[t]he bug fix *was* ultimately delivered to other clients the following tax year." 1-ER-29 (emphasis added).

The district court's "cross-use" rulings were erroneous.

## C. The District Court Erred in Holding Rimini in Contempt for Licensed Copying of an Oracle Database File.

The district court held Rimini in contempt for opening an Oracle Database file sent to Rimini engineers by a client. This was error, because a copy made in support of a licensee's internal business operations is licensed, does not violate the injunction, and cannot form the basis of a contempt sanction.

### 1. The OLSA Authorized Rimini's Copying.

Paragraph 15 of the injunction states that "Rimini Street shall not reproduce, prepare derivative works from, or distribute Oracle Database software." 3-ER-612. The district court has made clear, however, that this provision "does not prohibit all copying of Oracle Database." 1-ER-85. The OLSA expressly permits Rimini to make copies on behalf of the licensee when done for the licensee's internal business

41

operations. Programs such as PeopleSoft and JDE depend on the Oracle Database program; simply running either of these programs necessarily makes a copy of Oracle Database. *See* 2-ER-101-02; 1-ER-49; 1-ER-85. The district court held that such copies do not violate paragraph 15 of the injunction. 1-ER-49.

The district court nonetheless held that Rimini *willfully* violated paragraph 15 of the permanent injunction by simply opening an Oracle Database file (and thus automatically making a copy) sent to it by a client seeking technical support, because in doing so Rimini "acted outside the plain meaning of the [relevant license agreement], as previously held, and against the direct rulings of this Court." 1-ER-50.

This ruling is impossible to square with the terms of the OLSA. Section C of the relevant OLSA provides unequivocally that the licensee has been granted the "right to use the programs … solely for [its] internal business operations." 8-ER-1643. Section D further provides that the licensee "may make a sufficient number of copies of each program … for [its] licensed use." 8-ER-1643. Section C also explicitly provides that the licensee "may allow [its] agents and contractors … to use the programs" for the licensee's "internal business operations." 8-ER-1643.

This unambiguous language gives Oracle's licensees the right to service their own software or to hire someone, like Rimini, to do it for them. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Apple Comp.,*

*Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1440 (9th Cir. 1994). Here, it is undisputed that a licensed client sent an Oracle Database file to a Rimini engineer to obtain support for the client's internal business operations. 1-ER-50. That licensed conduct cannot violate the injunction, let alone do so willfully.

The district court's interpretation of the license agreement—which permits Rimini to "use" the software but not "copy" it—makes no sense. This is because the very act of running an Oracle program *necessarily* creates a copy of the program. 2-ER-101-02; 1-ER-49; 1-ER-85. In other words, Rimini could not "use" the program *without* also "copying" it. Interpreting the license agreement to permit the former while prohibiting the latter was patently unreasonable. Therefore, the district court's construction of the license was erroneous. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) (when interpreting an agreement, "[p]reference must be given to reasonable interpretations as opposed to those that are unreasonable") (citation omitted).

## 2. The Terms of the OLSA Are Properly Before This Court.

In a previous appeal, this Court held that Rimini waived its challenge to the district court's 2014 summary judgment ruling on Oracle Database by failing adequately to brief it in the opening brief. *See Oracle*, 879 F.3d at 960. But Rimini's failure to appeal from the Court's *summary judgment* decision in no way forecloses Rimini from defending itself against *contempt*.

43

Rimini was held liable on summary judgment in *Rimini I* for downloading copies of Oracle Database pursuant to a *developer* license—a different license from the OLSA at issue here. *See* 1-ER-49-50. The developer license did not permit Rimini to make copies for commercial purposes, and Rimini was *also* creating generic environments not solely for the use of the licensee's internal data processing operations, *i.e.*, "cross-using" them. 5-ER-1047-1048; 1-ER-50. That is what paragraph 15 of the injunction was meant to prohibit. *See* 1-ER-49; 1-ER-85. The district court very clearly stated that paragraph 15 was not meant to prohibit all copying of Oracle Database whatsoever. 1-ER-85.

But the issue in the contempt proceeding, and now before this Court, "is strikingly different from that held unlawful on summary judgment" in *Rimini I*. 1-ER-50. As the district court acknowledged, "here, Rimini's client sent the file to Rimini, and therefore, *Rimini's conduct is governed by the OLSA*, and *Rimini used that file to support its client's sole internal data processing operations*." 1-ER-50 (emphases added). There is no dispute that the question before this Court concerns the OLSA, not the developer license.

Oracle might argue that Rimini's failure to appeal the district court's summary judgment ruling on the OLSA somehow forecloses review of a contempt sanction related to the OLSA. That would be incorrect. Even a defense "withdrawn" pre-judgment is available "in a later proceeding," including "a contempt action," under

"the normal rules of" *res judicata*. *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1313, 1318 (Fed. Cir. 2004). And it is indisputable that Rimini's conduct here does not involve "the same transactional nucleus of facts" (*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1078 (9th Cir. 2003)); it is "strikingly" different conduct. Moreover, this Court has the power to review the issue "to prevent manifest injustice" (*Retail Flooring Dealers of Am., Inc. v. Beaulieu of Am., LLC*, 339 F.3d 1146, 1150 & n.5 (9th Cir. 2003) (reversing sanctions on grounds not raised in the court below)), and should do so here. The issue is purely a legal one, there are no facts that need developing (*see Ho v. Brennan*, 721 F. App'x 678, 680 & n.1 (9th Cir. 2018)), and the terms of the license clearly permit Rimini to make copies of Oracle Database.

Affirming the contempt order on this ground would condone a clear instance of copyright misuse by prohibiting direct maintenance of Oracle Database by an Oracle competitor. Oracle cannot prohibit third-party support for its Oracle Database program by forcing its licensees to use Oracle or do it themselves, and the OLSA should not be so construed. *See Oracle*, 879 F.3d at 957-58; *see also Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 792 & n.77 (5th Cir. 1999).

\*     \*     \*

45

This Court should reverse the contempt order and hold that *de minimis* copying, what the district court described as "cross-use" in the contempt order, and copying of Oracle Database pursuant to the OLSA are not prohibited by the injunction. And although the district court held Rimini in contempt on other grounds as well, it imposed sanctions, attorneys' fees, and costs as an indivisible sanction. As a result, reversal of any part of the judgment requires vacatur of the sanctions and a remand for reconsideration of the appropriate sanction. *See*, *e.g.*, *Oracle*, 879 F.3d at 964-66.

## II. The District Court Erred in Holding Rimini in Contempt for Conduct That Is More Than Colorably Different from the Conduct Adjudicated in *Rimini I.*

The district court independently erred in adjudicating via a contempt proceeding conduct that was "more than colorably different" from that adjudicated in *Rimini I*. Under the Federal Circuit's well-reasoned decision in *TiVo*, the conduct Oracle accused as contumacious should have been adjudicated in a separate civil lawsuit. This error requires reversal of the contempt order in its entirety.

### A. *TiVo* Requires Civil Litigation, Not a Contempt Proceeding, for the Adjudication of Colorably Different Conduct.

The Seventh Amendment guarantees a jury trial in copyright cases. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348-52 (1998). Once a jury has adjudicated conduct unlawful, district courts have authority to enforce injunctions through a contempt proceeding. But recognizing the potential for abuse of contempt

proceedings, the Supreme Court, in what is frequently called the "fair ground of doubt" test, has long held that "a new suit against the defendant … is by far the most appropriate [procedure] where it is really a doubtful question whether the new process adopted is an infringement or not." *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885).

These foundational tenets gave rise to the Federal Circuit's *TiVo* standard, which requires processes accused of violating an intellectual property injunction that are "more than colorably different" than the processes previously adjudicated infringing to be decided in a new civil proceeding, not contempt. *TiVo*, 646 F.3d at 882-83 (discussing *Cal. Artificial Stone Paving*, 113 U.S. at 618); *see also KSM Fastening Sys., Inc. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1530 (Fed. Cir. 1985), *overruled in part by TiVo*, 646 F.3d 869. The "more than colorably different" standard is satisfied when the "differences between the old and new elements" of the processes at issue "are significant." *TiVo*, 646 F.3d at 882.

Although this Court has not yet adopted *TiVo*'s specific framework for intellectual property cases, *TiVo* is entirely consistent with this Court's decisions carefully cabining civil contempt proceedings. *See In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) ("[A] person should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the court's order.'") (quoting *Vertex Distrib., Inc. v. Falcon Foam*

*Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)); *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801-02 (2019) (instructing this Court to apply the "fair ground of doubt" standard to contempt proceedings in bankruptcy cases).

### B. The District Court Erroneously Refused to Apply *TiVo*.

Relying on a single unpublished district court decision, the district court rejected Rimini's request "to determine whether Rimini's new support Process 2.0 is more than colorably different than its prior Process 1.0" on the sole ground that *TiVo* was a "patent case." 1-ER-71 (citing *Disney Enters., Inc. v. VidAngel Inc.*, 2017 WL 6820015, at *2 (C.D. Cal. Sept. 13, 2017)). This was error. There is no conceivable reason *not* to apply the *TiVo* framework in copyright cases, nor did the district court articulate one.

In brushing *TiVo* aside, the district court ignored the "historic kinship between patent law and copyright law" and the "basic similarities between copyrights and patents." *Sony*, 464 U.S. at 439 & n.19. Copyrights and patents both derive from the same source of constitutional authority (U.S. Const. art. I, § 8, cl. 8), and both extend a "limited" monopoly for a "public purpose" (*Sony*, 464 U.S. at 429; *Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 666 (1944)). The Supreme Court has long applied legal doctrines consistently across both fields unless there is a specific statutory or historical reason not to. *See, e.g.*, *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 959 (2017); *Petrella*

*v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 & n.15 (2014); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392 (2006); *Sony*, 464 U.S. at 442; *United States v. Paramount Pictures*, 334 U.S. 131, 157-58 (1948); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 131 (1932). Indeed, the Supreme Court has done so *with respect to this very case*. *See Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 373 (2019) (relying on the construction of "costs" in the Copyright Act in *Rimini*, 139 S. Ct. at 881, to interpret "expenses" in the Patent Act).

It makes no sense whatsoever to hold that someone accused of violating a *patent* infringement injunction is entitled to separate civil proceedings when the person has legitimately built or designed around previous patent infringement by creating a process or product "more than colorably different" from the infringing process or product, but that the same protections are not available to someone accused of violating a *copyright* infringement injunction when they have similarly revised a process to avoid infringing. The ability legitimately to design around infringement advances the purposes of both the Patent and Copyright Clauses of the Constitution. *See*, *e.g.*, *State Indus. Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("One of the benefits of a patent system is the so-called 'negative incentive' to 'design around' a competitor's products[.]").

The district court's failure to apply the correct legal standard alone is reason to reverse and remand. *Manufactured Home Cmtys. Inc. v. City of San Jose*, 420

F.3d 1022, 1037 (9th Cir. 2005); *see also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020). And had the district court applied *TiVo*, it could not have held Rimini in contempt. As described above, the conduct for which Rimini was found in contempt was not previously adjudicated as infringing. Oracle would have been required to bring a separate civil lawsuit, convince a jury that Rimini's new processes were infringing, and obtain an injunction prohibiting that conduct.

For example, as to JDE *de minimis* copying, the district court recognized that whether Rimini could, consistent with the JDE license agreements, make copies of JDE source code so long as it was not engaged in "cross-use" "ha[d] never been interpreted or decided by [the] Court" and was actually an issue reserved for the *Rimini II* proceeding. 1-ER-46-47. A party cannot be held in contempt for issues not "decided" in the underlying litigation.

Likewise, there is no dispute that Rimini ceased entirely the use of locally hosted generic development environments—the "cross-use" Oracle alleged in *Rimini I*. Throughout the post-injunction period, each Rimini client had its own unique, siloed development environment, stored only on that client's own systems, which Rimini accessed only remotely to develop and test fixes and updates using only that client's Oracle software. 2-ER-298-99; 4-ER-793-94. Instead of closing the contempt proceeding there, the district court used the proceeding drastically to expand the concept of "cross-use" to fault Rimini for engaging in entirely different

50

conduct, laying down for the first time (impossible-to-comply-with) standards for Rimini engineers providing support in client-specific development environments. *Rimini I* had nothing to do with the lawfulness of such conduct.

As to the Oracle Database conduct, the district court itself admitted that "the situation … is strikingly different from that held unlawful at summary judgment" in *Rimini I*. 1-ER-50. The court was right. In *Rimini I*, it found that Rimini had infringed Oracle's copyrights as to Oracle Database by, pursuant to a limited developer license, downloading Oracle Database directly from Oracle's website, and "cross-using" generic environments. *See Oracle*, 6 F. Supp. 3d at 1116-19. But here, the court found that Rimini clients *sent* their licensed Oracle Database files to Rimini unsolicited as part of service requests, that the conduct *was* governed by a distinct and broader license (the OLSA), *and* that Rimini used the files at issue *solely* for the client's internal business purposes, *i.e.*, there was no cross-use. 1-ER-50. That certainly indicates more than a colorable difference.

The same is true for the individual PeopleSoft files found on Rimini's systems. 1-ER-8-20. In *Rimini I*, Rimini's standard support process for clients included running *entire* PeopleSoft software environments on its systems. A PeopleSoft environment is comprised of "thousands of PeopleSoft files," as well as "all of the PeopleTools" and a "database system," and, unlike an individual PeopleSoft file, can be executed and run on Rimini's systems. 2-ER-318. The

district court held that these environments were not expressly licensed because the applicable licenses limited the use of PeopleSoft software to the client's own "facilities." *Oracle*, 879 F.3d at 959-60 & n.6. As a result, Rimini changed its standard support process: Rimini moved all PeopleSoft environments off of its systems and back to clients, adopted policies that prevented making copies of PeopleSoft software on its systems, and now takes numerous steps to educate clients about those policies and otherwise prevent unauthorized materials from being placed on its systems. *See supra* at pp. 9, 13; 2-ER-123-31; 2-ER-323-26; 2-ER-339-40.

Despite those comprehensive changes, Oracle found that in a handful of instances—out of the tens of thousands of individual PeopleSoft updates Rimini provided in the relevant time period (2-ER-252; *see also* 2-ER-338)—a *client sent* Rimini *isolated* PeopleSoft files when seeking software support, *against Rimini's policies*, and then a software engineer opened or forwarded the file internally in some cases (*see* 1-ER-14; 1-ER-16; 1-ER-18; 1-ER-48). That conduct is decidedly different in kind than the conduct for which Rimini was held liable in *Rimini I* and which this Court affirmed on appeal. *Compare* 1-ER-8-20, *with Oracle*, 879 F.3d at 959-60 & n.6.

* * *

The district court's failure to apply *TiVo* was a foundational legal error that requires reversal of the entire contempt order. On remand, the court must first

52

determine under *TiVo* whether any of the conduct Oracle accuses is not colorably different from that adjudicated in *Rimini I*. If so, only that conduct can properly be included in a contempt proceeding.

## III. The District Court's Sanctions Must Be Vacated.

The district court imposed a flat, non-purgeable $630,000 fine, as well as an award of attorneys' fees and costs, as a contempt sanction, "find[ing] that this sizable statutory sanction, and what the Court anticipates will be sizable attorney's fees and costs, serves to not only *compensate* Oracle for Rimini's contemptuous behavior, but also *compel Rimini* to comply with the Court's Orders and abide by the Permanent Injunction going forward." 1-ER-56 (emphases added). The sanction fails standards for both coercive and compensatory civil sanctions, revealing it for what it is—an improper punitive sanction that must be vacated because Rimini was denied the protections of a jury trial and proof beyond a reasonable doubt.

### A. Civil Contempt Sanctions Must Be Carefully Cabined to Not Become Punitive, Criminal Contempt Sanctions.

Courts have power to sanction contempt, but because that power is "shielded from direct democratic controls," it "must be exercised with restraint." *U.S. Dist. Ct. for N. Mariana Islands*, 694 F.3d at 1059 (quotation marks omitted). "A court's contempt powers are broadly divided into two categories: civil contempt and criminal contempt." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016). Criminal contempt is "punitive" in nature. *Id.* at 629. The "hallmarks

of punitive contempt" are "retroactivity and determinacy." *Parsons*, 949 F.3d at 456. Courts have long recognized that "noncompensatory sanctions" "predicated on out-of-court disobedience to complex injunctions" can push a sanction into the criminal/punitive category. *Id.* (citation and quotations omitted). Criminal contempt sanctions cannot be imposed consistent with due process in the absence of a jury trial and proof beyond a reasonable doubt. *Ahearn*, 721 F.3d at 1129-30.

Civil contempt sanctions, on the other hand, do not require such heightened procedural protections, but are nonetheless appropriate only to "coerc[e] compliance with a court order" and/or "compensat[e] the prevailing party" for losses caused by the contumacious conduct. *Ahearn*, 721 F.3d at 1128. Even civil sanctions have limits, with each type (coercive and compensatory) having its own separate "standard" that must be met. *Gen. Signal*, 787 F.2d at 1380.

"Coercive [civil] sanctions may only be imposed 'after a reasoned consideration' of 'the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Parsons*, 949 F.3d at 457 (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983)). Moreover, "[if] a fine is" coercive, "it is civil only if the contemnor is afforded an opportunity to purge" the fine by taking some action to remediate the underlying issue. *Ironworkers*, 169 F.3d at 1221 (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821,

54

829 (1994)). And a coercive sanction, or any portion of a sanction that is coercive, must be paid to the court, not the other party. *See Gen. Signal*, 787 F.2d at 1380; *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1111 (9th Cir. 2005); *Bingman v. Ward*, 100 F.3d 653, 656 (9th Cir. 1996); *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 658 (2d Cir. 2004); *In re Chase & Sanborn Corp.*, 872 F.2d 397, 401 (11th Cir. 1989).

"[C]ompensatory fines" paid to the party or the court, on the other hand, "'must be based on' the 'actual losses sustained as a result of contumacy.'" *Parsons*, 949 F.3d at 457 (quoting *Shuffler*, 720 F.2d at 1148); *see also In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1366 (9th Cir. 1987); *Paramedics*, 369 F.3d at 658.

"Whether a contempt sanction is civil or criminal is determined by examining 'the character of the relief itself.'" *Ahearn*, 721 F.3d at 1129 (quoting *Bagwell*, 512 U.S. at 828).

### B. The District Court's Order of Sanctions Is Not Properly Coercive or Compensatory.

The district court's order of sanctions fails the basic requirements for civil contempt sanctions. The order purports to be a civil coercive sanction that is both coercive and compensatory. But it fails the legal requirements for either civil coercive or compensatory sanctions, revealing it to be a punitive sanction

impermissibly imposed on Rimini without the benefit of a jury trial and proof beyond a reasonable doubt.

The sanctions cannot be a proper civil *coercive* penalty, because they were ordered to be paid to "Oracle." *See* 1-ER-55-56. In *General Signal*, this Court held in reversing a $400,000 contempt sanction that "[i]f the fine, or any portion of the fine, is coercive, it should be payable to the court, not [the other party]." 787 F.2d at 1380; *see also, e.g.*, *Paramedics*, 369 F.3d at 658; *Chase & Sanborn*, 872 F.2d at 401.

A civil contempt award that is coercive and compensatory must specify the portion of the sanction attributable to each, with the coercive amount payable to the court. As this Court explained: Where "the award is both compensatory and coercive the district court should specify the amount awarded under each theory based on the [distinct standards for coercive and compensatory civil sanctions] and split payment of the award between [Oracle] and the court accordingly." *Gen. Signal*, 787 F.2d at 1380; *see also Chase & Sanborn*, 872 F.2d at 401. This error alone is sufficient to vacate the sanction.

The district court's order of sanctions is also not a proper *compensatory* sanction because it is undisputedly not based on any actual loss by Oracle. "Compensatory awards are limited to 'actual losses *sustained as a result of the contumacy.*'" *Gen. Signal*, 787 F.2d at 1380 (quoting *Shuffler*, 720 F.2d at 1148).

Oracle was not harmed by the alleged contumacy and has never put forward any evidence that it was. Oracle presented no evidence of damages at the hearing, because it does not have any. *See* 1-ER-87. In awarding sanctions to "compensate Oracle," the district court never evaluated Oracle's losses and explicitly declined to do so. 1-ER-54; 1-ER-56. "There is nothing in the record to indicate that [Oracle] lost $[63]0,000 as a result of the violation of the [permanent injunction]," and so the sanction should be vacated. *Gen. Signal*, 787 F.2d at 1380; *see also Chase & Sanborn*, 872 F.2d at 401.

### C.     The Punitive Contempt Sanctions Must Be Vacated.

Because the $630,000 fine is actually punitive, and Rimini was denied a jury trial and proof beyond a reasonable doubt (*see* 1-ER-85-87), the sanction must be vacated.

The $630,000 sanction has all the "hallmarks of punitive contempt": It is both "retroactiv[e] and determina[te]." *Parsons*, 949 F.3d at 456. The sanction is also non-purgeable. It was not conditioned on Rimini coming into compliance with the injunction; it was payable regardless.

The key to coercive civil sanctions is that the contemnor "carries the keys of his prison in his own pocket." *Bagwell*, 512 U.S. at 828. For example, the court ordered Rimini to quarantine the files it found in contempt within 7 days of the order, which Rimini did. That was a proper coercive sanction. But the court went further

and ordered Rimini to pay $630,000 of non-compensatory sanctions to Oracle. If, as the Supreme Court has held, "a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance" (*id.* at 829), surely the same must be said of the fine here. And this Court has made clear that "a fine payable to an opposing party [is] punitive [if] it was not designed 'to compensate [the opposing party] for any actual or estimated harm.'" *Lasar*, 399 F.3d at 1111 (quoting *Bingman*, 100 F.3d at 656).

The district court tried to justify its sanction solely on the theory that "[c]ompensatory sanctions may be awarded in the form of statutory damages pursuant to the Copyright Act, 17 U.S.C. § 504, when the contemptuous behavior involves copyright infringement." 1-ER-54-55. That was wrong.

The Copyright Act's statutory damages provision does not, by its plain terms, apply to the civil contempt context. *See* 17 U.S.C. § 504. Indeed, this Court has recognized that statutory damages under the Copyright Act serve "compensatory *and punitive purposes*" (*L.A. News Serv. v. Reuters Television Int'l Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (emphasis added)), by promoting copyright enforcement "even where actual damages are unproved" (*de Fontbrune v. Wofsy*, 838 F.3d 992, 1005 (9th Cir. 2016); *see also U2 Home Entm't*, 245 F. App'x at 30). The district court's reliance on the Copyright Act's statutory damages provision is a recognition that

Oracle failed to prove any actual damages resulting from the contempt, and that the sanctions awarded are necessarily punitive. The court's willfulness findings (and enhancement of the statutory damages award) add insult to injury by punishing Rimini even more despite Oracle's lack of harm. *See* 1-ER-55-56.

The Second Circuit has properly and explicitly rejected the imposition of civil contempt sanctions in the form of statutory damages because "the sanction should correspond at least to some degree with the amount of damages." *U2 Home Entm't*, 245 F. App'x at 30 (cleaned up).[3] This Court, moreover, has never endorsed the theory that actual losses resulting from civil contempt may be supplanted by mechanical statutory damages under the Copyright Act. Instead, this Court has consistently tied compensatory sanctions to *actual* losses. *See*, *e.g.*, *Parsons*, 949 F.3d at 457; *Ahearn*, 721 F.3d at 1131; *Crystal Palace*, 817 F.2d at 1366-67; *Shuffler*, 720 F.2d at 1148. The Court should do the same here.

The district court's order that Rimini must pay attorneys' fees and costs (in an amount yet to be determined) as a sanction is similarly flawed. The attorneys' fees

---

[3]   Although the Second Circuit did "not foreclose the possibility that in some civil contempt cases, statutory damages may be useful in estimating actual damages" when a defendant refuses to participate in discovery about the damages (something that did not happen here), it held that the district court "erred in imposing civil contempt sanctions equivalent to the maximum statutory damages for 'willful' copyright violations … because such damages are punitive in nature, and thus inconsistent with the remedial purpose of a compensatory civil contempt fine." *U2 Home Entm't*, 245 F. App'x at 30 (emphasis omitted).

59

and costs sanction purports to be, along with the $630,000 sanction, both *coercive and compensatory*. 1-ER-56. Yet also like the $630,000 sanction, the district court made the entire amount payable to Oracle. 1-ER-54-56. That is reversible error.

The district court also failed to cabin attorneys' fees and costs to only the amount attributable to contumacious conduct. Attorneys' fees and costs cannot be paid as a "compensatory" sanction in "civil contempt" if those fees and costs "were not caused by" *contumacious* conduct. *Gen. Signal*, 787 F.2d at 1380 (refusing to award "$195,000 in attorney's fees" that "were not caused by [the other party's] violation of the consent judgment"). That principle is buttressed by the Supreme Court's decision in *Goodyear*, which holds that for an attorneys' fees sanction to be "compensatory" (and not punitive), the sanction may shift "only the portion of [attorneys'] fees that [Oracle] would not have paid but for" the contumacious conduct. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1187 (2017).

Oracle lost the vast majority of its contempt allegations. It accused essentially every aspect of Process 2.0 of violating the injunction, and the court rejected each of those sweeping theories out of hand as improper attempts to "enjoin conduct that has yet to be adjudicated unlawful." 1-ER-67; *see* 1-ER-68; 1-ER-72-73; 1-ER-77; 1-ER-82-85. The court also found that Oracle had not met its burden of proof on additional allegations of contempt and, after identifying ten isolated issues for an evidentiary hearing, ultimately dismissed half of even those as non-contumacious.

60

When all was said and done, Oracle's everything-under-the-sun charges of contempt ended up showing (at most) a handful of technical, one-off violations of the injunction. Oracle promised a mountain and delivered an anthill. Requiring Rimini to subsidize Oracle's failed efforts serves only to punish Rimini.

The district court's contempt sanctions are impermissibly punitive, and must be vacated no matter how this Court resolves Rimini's challenges to the underlying contempt findings.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

Dated: May 18, 2022

s/ *Blaine H. Evanson*

Mark A. Perry
WEIL, GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
(202) 682-7511
Mark.Perry@weil.com

Jeremy M. Christiansen
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Samuel G. Liversidge
Eric D. Vandevelde
Blaine H. Evanson
Ilissa S. Samplin
Casey J. McCracken
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(949) 451-3805
BEvanson@gibsondunn.com

*Attorneys for Defendant-Appellant Rimini Street, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 22-15188

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

◯ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◯ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Blaine H. Evanson    **Date** | May 18, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-15188

I am the attorney or self-represented party.

**This brief contains** | 13,994 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.

- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

  - ○ it is a joint brief submitted by separately represented parties;
  - ○ a party or parties are filing a single brief in response to multiple briefs; or
  - ○ a party or parties are filing a single brief in response to a longer joint brief.

- ○ complies with the length limit designated by court order dated [          ].

- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s Blaine H. Evanson | **Date** | May 18, 2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 22-15188

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Opening Brief for Appellant Rimini Street, Inc.

**Signature** | /s Blaine H. Evanson    **Date** | May 18, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

## ADDENDUM

Pursuant to Circuit Rule 28-2.7, this addendum includes the following pertinent constitutional and statutory provisions, reproduced verbatim:

**Exhibit A**:  U.S. Const. art. I, § 8, cl. 8

**Exhibit B**:  17 U.S.C. §§ 502 & 504

# EXHIBIT A

**U.S. Const. art. I, § 8, cl. 8**

**Article I**

**Section 8: Powers of Congress**

The Congress shall have Power …

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries[.]

# EXHIBIT B

## 17 U.S.C. §§ 502 & 504

## § 502.  Remedies for infringement:  Injunctions

(a) Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

(b) Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.

## § 504.  Remedies for infringement:  Damages and profits

(a) In General. — Except as otherwise provided by this title, an infringer of copyright is liable for either—

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

(b) Actual Damages and Profits.—

The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

(c) Statutory Damages.—

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under

section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in section 118(f)) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

(3)

(A) In a case of infringement, it shall be a rebuttable presumption that the infringement was committed willfully for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the infringement.

(B) Nothing in this paragraph limits what may be considered willful infringement under this subsection.

(C) For purposes of this paragraph, the term "domain name" has the meaning given that term in section 45 of the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes" approved July 5, 1946 (commonly referred to as the "Trademark Act of 1946"; 15 U.S.C. 1127).

(d) Additional Damages in Certain Cases.—

In any case in which the court finds that a defendant proprietor of an establishment who claims as a defense that its activities were exempt under section 110(5) did not have reasonable grounds to believe that its use of a copyrighted work was exempt under such section, the plaintiff shall be entitled to, in addition to any award of damages under this section, an additional award of two times the amount of the license fee that the proprietor of the establishment concerned should have paid the plaintiff for such use during the preceding period of up to 3 years.